UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | Civil Action No.:3:22-cv-30121 |
| AIT THERMOLITE, INC., ) | |
| ADVANCED IMPACT ) | |
| TECHNOLOGIES, INC., ) | |
| LTI SMART GLASS, INC., and ) | |
| KAPILOFF'S GLASS, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| RICHARD S. CHAMPLIN, ) | |
| IMPACT SECURITY, LLC, and ) | |
| WINDOW FILM DEPOT, INC., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................ ii-iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

A.   *Plaintiffs' Business and Confidential Information* ........................................ 1

B.   *Plaintiffs Aquire Champlin's Thermo-O-Lite Business* ................................ 2

C.   *The Employment Agreement* ........................................................................ 4

D.   *Champlin Begins Working for Impact in Violation of the Employment Agreement* ............... 5

ARGUMENT ............................................................................................................. 10

I. PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ......................................... 10

A.   *Plaintiffs Have a Strong Likelihood of Success on the Merits of their Claim for Breach of Contract* ........................................................................................ 11

B.   *Plaintiffs Have a Strong Likelihood of Success on the Merits of their Claim for Breach of Fiduciary Duty* ......................................................................................... 15

C.   *Plaintiffs Have a Strong Likelihood of Success on the Merits of their Claim Against Champlin for Breach of Implied Covenant of Good Faith and Fair Dealing* ............................. 16

II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THE REQUESTED INJUNCTIVE RELIEF ................................................................. 17

III. THE IRREPARABLE HARM TO PLAINTIFFS OUTWEIGHS ANY HARM THAT INJUNCTIVE RELIEF WOULD INFLICT ON DEFENDANTS ............................................. 19

IV. THE GRANTING OF THE REQUESTED INJUNCTIVE RELIEF OUTWEIGHS ANY HARM THAT INJUNCTIVE RELIEF WOULD INFLICT ON DEFENDANTS ..................... 20

CONCLUSION ............................................................................................................ 20

286965.3

i

## **TABLE OF AUTHORITIES**

**Cases**

*EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) ............................ 10

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996) ...................... 10

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998) ........................................ 10

*Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 493-94 (Mass. App. Ct. 1986) 10

*Singarella v. Boston*, 342 Mass. 385, 387 (1961) .......................................................................... 11

*Automile Holdings, LLC v. McGovern*, 483 Mass. 797, 809 (2020) ............................................ 12

*New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977) ................................. 13

*Guerriero*, 2003 WL 23112398 at *6 ..................................................................................... 13, 19

*Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 243 (D. Mass.), *aff'd,* 731 F.3d 6 (1st Cir. 2013) ................................................................................................................................................ 13

*EMC Corp. v. Gresham*, 2001 WL 1763449, *3 (Mass. Super. Ct. Nov. 14, 2001) .................... 13

*Kroeger v. Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 316 (1982) ............................................... 13

*Wordwave, Inc. v. Owens*, 2004 WL 3250472, *2 (Mass. Super. Ct. Dec. 7, 2004) .................... 13

*Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972) ................................................. 14

*Touchpoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp.2d 23, 27-28 (D. Mass. 2004)……………………………………………………………………………………………14,19

*Bechtel Infrastructure Corp. v. Mass. Turnpike Auth.*, 2003 WL 21108412, *4 (Mass. Super. Ct. Apr. 10, 2003) ................................................................................................................................. 14

*J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc*., 357 Mass. 728 (1970) ........................ 14

*GSI Grp., L.L.C. v. Chief Indus., Inc*., No. 21-CV-3034, 2021 WL 6143551, at *5 (C.D. Ill. Mar. 8, 2021) ............................................................................................................................................ 14

*Amgen Inc. v. Zydus Pharms. (USA) Inc.*, No. CV1918806MASDEA, 2021 WL 2550449, at *2 (D.N.J. May 18, 2021) ................................................................................................................... 14

*Baker v. Wilmer Cutler Pickering Hale and Dorr LLP*, 91 Mass. App. Ct. 835, 842 (2017) ...... 15

*Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153,164 (1999) ............................................. 15, 16

*Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1,11 (1983) ............................................................... 15

*Gagnon v. Coombs*, 39 Mass. App. Ct. 144, 154 (1995) ............................................................... 15

*Meehan v. Shaughnessy*, 404 Mass. 419, 435 (1989) ................................................................... 15

*Diversified Ventures, Inc. v. Moriarty*, No. 910457, 1994 WL 879858, at *15 (Mass. Super. Feb. 14, 1994) ........................................................................................................................................ 16

*In re Cumberland Farms, Inc., 284 F.3d 216, 230 (1st Cir. 2002)* ............................................. 16

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *18 (D. Mass. July 15, 2021) ................................................................... 16

*Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 531 (1997) ....................... 16

*Principles of Corporate Governance* at § 5.05 comment to § 5.05(a), at 287–288 ..................... 16

*BNY Mellon, N.A. v. Schauer*, 2010 WL 3326965 *10 (Mass. Super. Ct. May 14, 2010) ..... 17, 19

*Stone Legal Res. Group*, 2003 WL 914994 at *6 ................................................................. 17, 19

*Hilb*, 2007 WL 5390399 ................................................................................................... 17

*Randstad Gen. Partner*, C.A. No. 09-2046-A, p. 6 ........................................................ 18

*Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616 (1980) ........................... 18

*IONA Techs.*, 2002 WL 1290217 at *3 ............................................................................. 18

*Marcam*, 885 F. Supp. at 297 ......................................................................................... 18

*Architext, Inc. v. Kikuchi*, 2005 WL 28464244, *3 (Mass. Super. Ct. May 19, 2005) ................ 18

*Ounce Labs*, C.A. No. 08-2377-BLS1 .............................................................................. 18

*Lombard*, 729 F. Supp.2d at 442 ..................................................................................... 18

*Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 50 (1998) ........................... 19

*Diversified Ventures, Inc. v. Moriarty*, 1994 WL 879858, *18 (Mass. Super. Ct. 1994) ............. 19

*Guerriero*, 2003 WL 23112398 at *10 ............................................................................. 20

*Edwards*, 2007 WL 2840360 at *6 ................................................................................... 20

*Lombard*, 2010 WL 2682449 at*4 ................................................................................... 20

*New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929, *3 (D. Mass. June 4, 1996) .... 20

286965.3

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs, AIT Thermolite, Inc., Advanced Impact Technologies, Inc., LTI Smart Glass, Inc., and Kapiloff's Glass, Inc., (collectively, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion for a preliminary injunction against Defendants, Richard S. Champlin ("Champlin"), Impact Security, LLC ("Impact") and Window Film Depot, Inc. ("WFD") (collectively, "Defendants").

## INTRODUCTION

Plaintiffs seek injunctive relief against the Defendants to enforce Champlin's employment agreement and to prevent Plaintiffs from continuing to suffer irreparable harm caused by Champlin's blatant acts of misconduct. Based on the evidence submitted herewith, there is a substantial likelihood that Plaintiffs will succeed on the merits of their claims that Champlin breached his contractual obligations and his fiduciary duty to Plaintiffs by accepting employment with Impact and WFD, who are direct competitors of Plaintiffs, *while he was still employed by Plaintiffs*. For nearly a year, Champlin actively competed with Plaintiffs on behalf of all Defendants while still under Plaintiffs' employ, and he continues to do so in violation of the restrictive covenants in his employment agreement. Plaintiffs respectfully submit that the Court must grant the requested injunctive relief to prevent further harm to Plaintiffs. The balance of harms tips in favor of Plaintiffs, and the requested injunctive relief will not adversely affect the public interest in any manner.

## STATEMENT OF FACTS

### A. *Plaintiffs' Business and Confidential Information*

Plaintiffs are affiliated companies, who are subsidiaries of the same parent/holding company, Advanced Impact Technologies Group, Inc. Affidavit of Jeffrey E. Besse ("Besse Aff.") ¶ 2. Together with their affiliates, Plaintiffs are leaders in the manufacturing and sales of

1

architectural, security, ballistic, blast, impact, and decorative glass laminates, among other advanced materials. Besse Aff. ¶ 3. Plaintiffs' products are sold under a variety of brands, and are highly recognized as leading products for security, privacy and decorative glass laminate solutions to many industries in the U.S. and around the world. Besse Aff. ¶ 4.

Plaintiffs have facilities in Massachusetts and Florida, and their products serve a variety of high end and niche markets including security for U.S. Embassies, banks, courthouses, school security, and public buildings to highlight a few. The products are designed to provide physical security, ballistic, blast, improved thermal performance and sound protection along with decorative appeal. These efforts include framing designs and extrusions unique for certain applications and patented designs. The products' leadership position in school security is well known and sought after with rebuild projects such as Sandy Hook, Columbine and Parkland, among the thousands of schools that utilize the unique proprietary product solutions. Besse Aff. ¶ 6.

Plaintiffs have incurred great expense and taken significant measures to keep secure their confidential information and trade secrets, which includes customer, product and pricing information and product testing protocols that are integral to Plaintiffs' efforts to develop and maintain its business. Besse Aff. ¶¶ 30-33. Champlin had access to this information during his employment with Plaintiffs and gained unique knowledge of Plaintiffs' customers, products, and business strategy. Besse Aff. ¶ 35.

**B. _Plaintiffs Acquire Champlin's Therm-O-Lite Business_**

In 2020, Plaintiffs' principal and CEO, Jeff Besse ("Besse"), had a conversation with Champlin, regarding a business quotation for a window product. Besse had known Champlin from the industry since approximately 2017. Besse Aff. ¶ 7. Champlin was an owner of Therm-O-Lite,

2

LLC ("Therm-O-Lite"), which was based in South Bend, Indiana. Besse Aff. ¶ 9.  During the conversation, Champlin mentioned that he was interested in selling his business Therm-O-Lite. Besse Aff. ¶ 8. Therm-O-Lite marketed a "secondary interior window system" product under the brand name "Thermolite", which has application in the same markets as Plaintiffs.  Besse Aff. ¶¶ 10-11.

During subsequent discussions, Champlin pitched Therm-O-Lite as a great business opportunity for Besse and Plaintiffs.  Champlin explained that if there was a deal, he was interested in staying on with the company under the new ownership and that, in addition to continuing to develop and expand the company, he could cross-promote the Plaintiffs' affiliated products to Therm-O-Lite's existing customer base.   Besse Aff. ¶ 12. Champlin and Besse repeatedly discussed that Champlin would maintain an active role would be an essential component of any deal. Champlin assured Besse that he could continue to run the Thermolite business with little support other than manufacturing. Besse Aff. ¶ 13. During the negotiations, Champlin mentioned that he also had various corporate opportunities that he could bring to the table.  For example, Champlin mentioned that he had a relationship with a company called Allied Window, Inc. (a key competitor of Plaintiffs), and they discussed possibly pursuing this company for eventual acquisition. Besse Aff. ¶ 14.

As a result of discussions with Champlin and in reliance on his promises, Besse decided to acquire the assets of Therm-O-Lite. Besse Aff. ¶ 15. In May 2020, the parties signed a letter of intent and Plaintiff AIT Group formed a new subsidiary, AIT Thermolite, to acquire the Thermolite assets.  Besse Aff. ¶¶ 16-17.

AIT Thermolite entered into an asset purchase agreement with Therm-O-Lite dated July 31, 2020 ("Asset Purchase Agreement"), which provided a financial benefit to Champlin. Besse

286965.3

Aff. ¶¶ 18-19. The deal transferred the assets of Champlin's business, including its goodwill.
The deal also included an employment agreement for Champlin with the buyer, AIT Thermolite,
with typical non-compete and non-solicitation obligations, to protect the value of the acquired
assets. Besse Aff. ¶ 20.

### C. *The Employment Agreement*

On August 19, 2020, Plaintiff AIT Thermolite entered into a two-year employment
agreement with Champlin ("Employment Agreement") to allow for a successful integration.
Pursuant to the Employment Agreement, Champlin was employed in an executive position, with
a title of "Director of Sales and Marketing".  Besse Aff. ¶¶ 23-25, Exh. 1, pages 1-2.

Champlin was paid an annual salary of $140,000, plus commissions, and benefits.  Besse
Aff. ¶ 26, Exh. 1, page 2. In the Employment Agreement, the parties acknowledged the structure
of the AIT Group and its affiliates. Champlin, under the direction of Besse as CEO, would have
responsibilities for AIT Thermolite, and would also perform marketing and sales duties for its
affiliates, which made sense because of the cross-selling opportunities for the affiliated
companies' related glass products.  Besse Aff. ¶¶ 27, Exh. 1, page 2. As a result, all of the
subsidiaries of AIT Group were referred to in the Employment Agreement and collectively
defined in the Employment Agreement as the "Company Group."  Besse Aff. ¶ 27, Exh. 1, page
2.  This includes each of the named Plaintiffs.

The Employment Agreement prohibited Champlin from engaging in any other business
or profession during the term and required him to devote himself to his new employer.  Besse
Aff. ¶ 28, Exh. 1, page 2. As a result, it was expected that Champlin would devote his full efforts
and attention to Plaintiffs and their affiliates' best interests through the term of the Employment
Agreement, which ended on September 1, 2022. Besse Aff. ¶ 29.

The Employment Agreement acknowledged that Champlin would have access to Plaintiffs' confidential information.  During his employment, Champlin did in fact have access to such information, including customer, product and pricing information and product testing protocols.  This information was developed before Champlin arrived, have been kept secret and provide a competitive advantage to Plaintiffs.  Besse Aff. ¶ 30.

The Employment Agreement contains important restrictive covenants. Besse Aff. ¶ 36, Exh. 1, page 7. During the term of the Employment Agreement and for two years after its termination (until September 2022), Champlin was, and is, prohibited from competing against the Plaintiffs and their affiliates.  *Id*., Exh. 1, page 7.  He is also prohibited from soliciting customers or employees. *Id*.  These restrictions are reasonable in the context of the consideration paid for the assets of Therm-O-Lite, and the scope and nature of Plaintiffs' business.

### D. *Champlin Begins Working for Impact in Violation of the Employment Agreement*

Because of his level of experience and his familiarity with the Thermolite brand, Besse trusted Champlin with significant latitude in the performance of his duties.  Champlin generally worked from Indiana and Besse was in Florida.  Besse Aff. ¶ 37.  Unfortunately, Besse later learned that Champlin had no intention to honor the terms of the Employment Agreement. Not only did Champlin fail to fulfill these obligations, but he began, in bad faith, to actively compete against his own employer in direct violation of the Employment Agreement and his duty of loyalty as an employee.

Documents forensically obtained from Chaplin's company-provided computer reveal on August 2, 2021, Champlin secretly signed a confidentiality agreement and was a candidate for a new position with an investment group, unrelated to Plaintiffs.  Besse Aff ¶ 50, Exh. 3. Not coincidentally, on that same day, Champlin sent an email to the President of Allied Window,

Inc., which is the same company that he had promoted as an acquisition opportunity, indicating that not only was he performing business development for the Thermolite brand but he was pursuing other opportunities, including one **"in the forced entry business using composite panels which there seems to be a growing industry with all of the urban nonsense going on. I am meeting with a group next week about making a change so I should know more**." (Emphasis added.) Besse Aff ¶ 51, Exh.4. In response to this, to the President of Allied Window, Inc. stated: "There is probably no person on the face of the planet who is better suited to take this company where it could go." Besse Aff ¶ 52, Exh. 4.

Champlin did not disclose any of this to Besse or the Plaintiffs, and never presented this opportunity to Plaintiffs. Besse Aff. ¶ 53. The reference to the "opportunity" in the "forced entry business," and a "meeting" about "making a change," was Champlin preparing for his new employment with the other Defendants (set forth below) as far back as August, 2021, even though he had a year left on his Employment Agreement. *Id.*

By the fall of 2021, Champlin made numerous business trips, including to Marietta, Georgia, which is where Impact and WFD are located, which did not have any legitimate business purpose for Plaintiffs. Besse Aff ¶ 49, Exh. 2, pages 5-7.

On October 11, 2021, while still employed by AIT Thermolite, Champlin signed "new hire" paperwork, including tax withholding and direct deposit forms to work for Defendant Impact, which also conducts business under the name "DefenseLite". This information was all scanned into his AIT Thermolite computer. Besse Aff. ¶ 54, Exh. 5. Impact is a direct competitor of the Plaintiffs. It provides engineered forced-entry and bullet resistant retrofit glazing products to schools, hospitals, retailers, municipal buildings and other at-risk property in the U.S. and Canada. Besse Aff. ¶ 55, Exh. 6.

At no time prior to becoming employed by Impact did Champlin inform Besse or the Board that he was working for a competitor. Besse Aff. ¶ 54.  Indeed, Champlin continued to deceive Plaintiffs, making it appear that he was honoring the Employment Agreement, when in fact he was actively competing against Plaintiffs.

For example, in a meeting in February 2022, Champlin expressed frustration with his position and stated to Besse that he wanted to spend more time developing real estate he owned. Besse was surprised because Champlin had a minimum two-year commitment and he had told Besse he was excited about the future, growing the business and integrating the company products. Besse reminded Champlin that Champlin's work was a key component of the decision to purchase the Therm-O-Lite assets, and about Champlin's assurances that he was going to take an active role to avoid shifting resources.  Besse Aff. ¶ 39. During the February 2022 conversation, Champlin did not disclose anything about working for a competitor.  On the contrary, he led Besse to believe he was working in Plaintiffs' best interests and honoring the Employment Agreement.  Besse Aff. ¶ 41. At precisely the same time Champlin was vowing to honor his obligations to Plaintiffs, Defendants issued a press release on February 9, 2022 (of which Plaintiffs were unaware at the time), announcing Champlin as the Vice-President of Sales at Impact.  Besse Aff. ¶ 66, Exh. 11.

Forensic evidence also reveals that at least as early as November, 2021, Champlin was promoting products for Plaintiffs and Impact at the same time (and being paid by both) to a large prospective customer. Besse Aff. ¶ 57, Exh. 7.  Even though Plaintiffs sell competing products, Champlin pitched Defendants' products to this customer stating that the meeting agenda would include to: "**Discuss the DefenseLite system which is an exterior overglaze with polycarbonate. Preserves existing glass and keeps forced entry from happening on doors**

**and window glass**."  Besse Aff. ¶ 58, Exh. 7.

Additional forensic data reveals that between December 2021 and August 2022, Champlin was actively out in the marketplace promoting and selling DefenseLite products to new and existing customers of Plaintiffs and its affiliates, and actively competing with Plaintiffs using their confidential information. Besse Aff. ¶ 59, Exhs. 2, 8, 9 and 10.  Champlin took business trips to New York, Las Vegas, Pennsylvania and Cleveland, to promote Impact. Besse Aff. ¶ 60.  On March 21, 2022, Champlin took a business trip to Las Vegas and stayed at the Bellagio Hotel using the address for Impact and WFD on his hotel registration. *Id.*, Exh. 2, page 27.

Champlin submitted bid packages on behalf of Impact for jobs that could be supplied by Plaintiffs, including large bids to Ameresco Inc., and several school projects, which were critical customer prospects for Plaintiffs, which had built national recognition on providing security glass for schools. Besse Aff. ¶ 61, Exh. 9.   Using Plaintiffs' confidential information, Champlin prepared competitive drawings, met with customers and promoted and disseminated Impact's marketing materials for Impact's competing products.  Besse Aff. ¶ 62, Exh. 9, pp. 8-10. On these bids, Champlin specified that he was submitting the bid on behalf of "**Impact Security/Window Film Depot,**" which are the named corporate defendants in this case. Besse Aff. ¶ 63, Exh. 9, pp. 3, 6, 7, and 12. Champlin was clearly involved in multiple professional projects on behalf of Impact, all while still employed by Plaintiffs and being paid under the Employment Agreement.  Besse Aff. ¶ 64, Exh. 10.

Throughout the first half of 2022, Champlin routinely deceived Besse by assuring Besse that Champlin had control of AIT Thermolite and was actively promoting the business, without ever mentioning his competing employment activities with the corporate defendants.  Champlin

286965.3

tricked Besse into believing that his business trips and activities were for the benefit of Plaintiffs, when they were actually used to promote his competing employers' products. Besse Aff. ¶ 65.

On February 11, 2022, Champlin entered into a Reciprocal NDA for Defenselite (Impact's product).  Champlin signed the NDA as the Vice President of Impact Security, for the stated purpose of entering into "certain business discussions" with another company.  This was during the Term of the Employment Agreement when he was required to present all corporate opportunities to the Plaintiffs.  He did not do so with respect to this prospect and was working for the benefit of the "Defenselite" brand and the corporate Defendants instead. Besse Aff. ¶ 69, Exh. 12.

In July 2022, Champlin registered for and attended a trade show representing and promoting Impact rather than the Plaintiffs. Besse Aff. ¶ 71, Exh. 13. Meanwhile, because Champlin was dedicating his efforts elsewhere, Plaintiffs' customers were complaining that Champlin was non-responsive and failing to do his job.  Besse Aff. ¶¶ 72-73, Exh. 14.   This was because he was actively working for another company.  *Id*.

Finally, in August 2022, Plaintiffs discovered a LinkedIn bio for Champlin that listed Impact as his employer and omitted any reference to AIT Thermolite.  That biography states that Champlin was President of Therm-O-Lite for over 10 years until January 2022, and then became "Vice President of Sales" of Defenselite from January 2022 to present. Besse Aff. ¶ 43.  Besse, who was shocked by the discovery, immediately contacted Champlin who did not deny his activities but tried to minimize the competitive nature of the work, and then abruptly ceased working. Besse Aff. ¶ 44.  Champlin's hasty departure caused Plaintiffs to dramatically shift resources and incur significant costs. Besse Aff. ¶ 47.  During his employment, Champlin was on AIT Thermolite's payroll and he received over $300,000 in wages and benefits. Besse Aff. ¶ 74.

286965.3

## ARGUMENT

"A district court may issue a preliminary injunction only upon considering '(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions…; and (4) the effect (if any) of the court's ruling on the public interest.'" *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996)). Plaintiffs have met these requirements.

## I.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS

While likelihood of success is the touchstone of the preliminary injunction inquiry, *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998), the Court "need not predict the eventual outcome on the merits with absolute assurance." *Ross-Simons of Warwick*, 102 F.3d at 15. As explained in detail below, Plaintiffs have a strong likelihood of success on the merits of employment-related claims, which warrants the injunctive relief sought. Where the evidence demonstrates the existence of a non-compete agreement and attendant background circumstances, issuance of preliminary injunction is proper. *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 493-94 (Mass. App. Ct. 1986). "Moreover, the purpose of the injunction is to prevent whatever future violations are likely to occur." *Id*.

Counts 1 through 3 of the Complaint arise out of Champlin's employment and the restrictive covenants in his Employment Agreement. They allege breach of contract (Count 1), breach of fiduciary duty (Count 2) and breach of the implied covenant of good faith and fair dealing (Count 3). Count 9 is for declaratory judgment seeking injunctive relief, *inter alia*, prohibiting the

corporate Defendants from employing Champlin and using Plaintiffs' confidential information.[1] The record establishes these claims showing that: (1) the Employment Agreement prohibited Champlin from competing with Plaintiffs; (2) the restrictive covenants were executed in conjunction with the sale of Champlin's sale of his business to Plaintiffs; (3) the restrictions are necessary to protect Plaintiffs' legitimate business interests and are reasonable and enforceable; and (4) Champlin has repudiated his obligations for purposes of competing with Plaintiffs, in violation of the Employment Agreement, Champlin's fiduciary duty of loyalty to Plaintiffs and the implied covenant of good faith and fair dealing.

      A.     **Plaintiffs Have a Strong Likelihood of Success on the Merits of Their Claim for Breach of Contract**

With respect to Count 1, in order to establish that Champlin breached his agreement with Plaintiffs, they must establish: (1) the existence of a contract; (2) for valid consideration; (3) performance by Plaintiffs and a breach by Champlin; and (4) damage to Plaintiffs. *See Singarella v. Boston*, 342 Mass. 385, 387 (1961).

Here, Champlin entered into the Employment Agreement as part of the Asset Purchase Agreement and for continued employment with AIT Thermolite[2] and the associated compensation and valuable benefits. Plaintiffs performed their end of the bargain by purchasing the assets and compensating Champlin.  Champlin's perfidious conduct during his employment, as set forth herein, breached the Employment Agreement in myriad ways, including but not limited to, by: (i) failing to perform his duties to devote his time and efforts to Plaintiffs and to use his best efforts to promote Plaintiffs' interests in violation of Sections 1.2 ,1.3 and 3.2; (ii) engaging in a

---

[1] By virtue of Plaintiffs' likelihood of success on the merits on Counts 1-3, the Court may impose the preliminary injunctive relief sought over all Defendants, as it relates to Champlin's employment and the use of Plaintiffs' confidential information by Defendants.

[2] Per Section 3.1 and 3.2 of the employment Agreement, the affiliate Plaintiffs are intended beneficiaries of the contract.

286965.3

competing business in violation of Sections 1.4 and 3.2; (iii) improperly using Plaintiffs'
confidential information in violation of Section 7.1(c); and (iv) engaging in prohibited activity by
competing against Plaintiffs in violation of Section 8.2.

Under the circumstances, the restrictive covenants in the Employment Agreement are
clearly enforceable. Indeed, the Massachusetts Supreme Judicial Court has recently stated that:

> "[c]oncern about the restricted individual and the probability of unequal
> bargaining power between an employer and an employee recedes when the
> restriction arises in the context of the sale of a business or ... the sale of an
> interest in a business. . . .  Buyers and sellers are more likely to have equal
> bargaining power and legal representation, the seller is likely to be able to
> rely on the proceeds of the sale to temporarily refrain from competition with
> the buyer, and the seller is typically paid a premium for agreeing not to
> compete with the buyer. . . . Moreover, where the sale includes good will, a
> broad noncompetition agreement may be necessary to assure that the buyer
> receives that which he [or she] purchased. . . . In light of these significant
> differences, restrictive covenants entered into as part of a sale of a business
> are examined less critically than those entered into as part of an employment
> agreement.  (Internal quotation marks omitted.) *Automile Holdings, LLC v.
> McGovern*,        483        Mass.        797,        809        (2020).

Here the restrictive covenants were entered into as part of the sale of Champlin's business.
Plaintiff AIT Thermolite purchased the assets of Therm-O-Lite, including its goodwill, from
Champlin. Besse Aff. ¶ 20.  A key component of the deal was Champlin's promise that he would
maintain an active role at the helm of Therm-O-Lite and would continue to run the Thermolite
business, expand the business and cross promote Plaintiffs' products. Besse Aff. ¶ 21. Plaintiffs
secured this promise by virtue of the Employment Agreement and its obligations and restrictions.
Besse Aff., Exh. 1.

The Employment Agreement is enforceable and Champlin clearly breached it by secretly
taking a simultaneous position with competing companies. Besse Aff., Exh. 5. Champlin's conduct
has denied Plaintiffs the benefit of their bargain. Plaintiffs were damaged, *inter alia*, by continuing
to compensate Champlin while he was actively competing against them and failing in his

286965.3

contractual duties, and by losing the expansion of business they would have received if he was doing his job. *See e.g.*, Besse Aff. Exhs. 2, 4, 7-10.

Champlin's breaches also damaged Plaintiffs' legitimate business interests. The protection of goodwill, confidential information, and trade secrets are widely accepted as legitimate business interests served by restrictive covenants. *See New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977) ("If any or all of these interests [trade secrets, confidential information, and goodwill] are present in a given case in which a noncompetitive covenant is part of a contractual agreement, . . . a court of equity will not deny enforcement of a reasonable covenant."); *Guerriero*, 2003 WL 23112398 at *6 ("Trade secrets, confidential data, and goodwill are all legitimate business interests of the employer that it may seek to protect by restrictive covenant.").

Damage to Plaintiffs' goodwill constitutes irreparable harm. *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 243 (D. Mass.), *aff'd,* 731 F.3d 6 (1st Cir. 2013). Goodwill is "a broad term and encompasses a variety of intangible business attributes such as the name, location and reputation, which tends to enable the business to retain its patronage." *EMC Corp. v. Gresham*, 2001 WL 1763449, *3 (Mass. Super. Ct. Nov. 14, 2001) (citations and internal punctuation omitted). Goodwill includes "[a]n employer's positive reputation or position in the eyes of its customers or potential customers." *Id.* As such, "[g]ood will generally applies to customer relationships." *Kroeger v. Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 316 (1982) (citations omitted). Additionally, "[a]n ability to harm the employer's good will may derive from knowledge of confidential information." *Wordwave, Inc. v. Owens*, 2004 WL 3250472, *2 (Mass. Super. Ct. Dec. 7, 2004).

Champlin also violated Plaintiffs' legitimate business interests in protecting their confidential information.  In determining whether business information is confidential or a trade

secret, Massachusetts courts assess six factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees within the company; (3) the extent of measures taken by the employer to protect the secrecy of the information; (4) the value of the information to the company and to its competitors; (5) the amount of effort or expense incurred by the employer in developing this information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972); *Touchpoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp.2d 23, 27-28 (D. Mass. 2004). Broadly speaking, confidential information or a trade secret includes "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Bechtel Infrastructure Corp. v. Mass. Turnpike Auth.*, 2003 WL 21108412, *4 (Mass. Super. Ct. Apr. 10, 2003).

Here, Plaintiffs' customer, product and pricing information, business plans and strategies, and product testing protocols are all highly valuable and are protectible trade secrets.  Besse Aff. ¶¶ 30-33; *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728 (1970) (recognizing price list and customer list as trade secret or confidential information); *GSI Grp., L.L.C. v. Chief Indus., Inc.*, No. 21-CV-3034, 2021 WL 6143551, at *5 (C.D. Ill. Mar. 8, 2021) (product testing data may be protectable as trade secret); *Amgen Inc. v. Zydus Pharms. (USA) Inc.*, No. CV1918806MASDEA, 2021 WL 2550449, at *2 (D.N.J. May 18, 2021) (confidential research and development, product testing, and formulations or protectible as trade secrets). Plaintiffs took adequate measures to protect their trade secrets, including restricting access through a secure database and limiting access to key employees. Besse Aff. ¶ 32.  Champlin's active bidding for a

competitor using this information is a specific harm to Plaintiffs' goodwill, which Champlin derived from his knowledge of Plaintiffs' confidential information. Besse Aff. ¶¶ 59, 61-64.

The record evidence that Champlin breached Employment Agreement by surreptitiously working for a competitor and causing damage to Plaintiffs is shocking and overwhelming.

**B.** **Plaintiffs Have a Strong Likelihood of Success on the Merits of Their Claim for Breach of Fiduciary Duty**

With respect to Count 2, Plaintiffs must show: "(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages." *Baker v. Wilmer Cutler Pickering Hale and Dorr LLP*, 91 Mass. App. Ct. 835, 842 (2017) *citing Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153,164 (1999). "Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer." *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1,11 (1983). An employee who holds a position of "trust and confidence", which includes executives and management, has a fiduciary duty to his employer. *Id*.

A fiduciary duty is "a duty of utmost good faith and absolute loyalty." *Gagnon v. Coombs*, 39 Mass. App. Ct. 144, 154 (1995). Thus, an employee who owes a fiduciary duty to his employer "is bound to act solely for his employer's benefit in all matters within the scope of his employment." *Chelsea Indus., Inc.*, 389 Mass. at 11. An employee violates the duty of loyalty by engaging in active competition with his employer while still employed. *Meehan v. Shaughnessy*, 404 Mass. 419, 435 (1989).

Here, per the Employment Agreement, Champlin served as a member of Plaintiffs' executive management team and was tasked to operate AIT Thermolite as its Market President, which is indisputably a position of trust and confidence. Besse Aff., Exh. 1, Section 1.2. By taking on employment with Impact, Champlin began to serve two masters whose interests are

antagonistic, which is inherently disloyal. *Diversified Ventures, Inc. v. Moriarty*, No. 910457, 1994 WL 879858, at *15 (Mass. Super. Feb. 14, 1994) (a covenant not to compete are during employment is enforceable to protect the legitimate business interests of the employer and competition with employer during employment is a clear breach).   Champlin's promotion of Impact in the course of his duties for Plaintiffs and his misappropriation of corporate assets and usurping of corporate opportunities[3] also constitute clear breaches of fiduciary duty. *In re Cumberland Farms, Inc.*, 284 F.3d 216, 230 (1st Cir. 2002) ("Massachusetts courts hold that the failure to disclose a corporate opportunity is, in and of itself, a breach of the duty of loyalty."). Plaintiffs were causally damaged by these breaches including by the denial of the ability to pursue corporate opportunities and active competition by a salaried employee.

### C.   Plaintiffs Have a Strong Likelihood of Success on the Merits of Their Claim Against Champlin for Breach of the Implied Covenant of Good Faith and Fair Dealing

With respect to Count 3, "[t]o prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *18 (D. Mass. July 15, 2021).   Conduct such as actively using trade secrets to market competing products and steering customers towards a competitor constitutes breach on the implied covenant of good faith and fair dealing.   *Id.*

---

[3] Champlin cannot argue that these opportunities would not have been pursued by Plaintiffs. *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 170 (1999) ("[B]ecause full disclosure did not occur here, we do not need to address whether [Plaintiff] could have feasibly pursued [the Covenant opportunity]. The nondisclosure of a corporate opportunity is, in itself, unfair to a corporation and a breach of fiduciary duty."); *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 531 (1997), *citing Principles of Corporate Governance* at § 5.05 comment to § 5.05(a), at 287–288 (senior executive must offer opportunity to the corporation before taking it for personal advantage, and should disclose all known material facts).

Here, Champlin has done just that. Between December 2021 and August 2022, Champlin was in the marketplace promoting and selling DefenseLite products to new and existing customers of Plaintiffs and their affiliates, and actively competing with Plaintiffs using their confidential information. Besse Aff. ¶ 59, Exhs. 2, 8, 9 and 10. Champlin was promoting products for Plaintiffs and Impact at the same time (and being paid by both) to a large prospective customer.  Besse Aff. ¶ 57, Exh. 7.  Champlin submitted bid packages on behalf of Impact for jobs that could be supplied by Plaintiffs, including large bids to Ameresco Inc., and several school projects, which were critical customer prospects for Plaintiffs, which had built national recognition on providing security glass for schools. Besse Aff. ¶ 61, Exh. 9. Using Plaintiffs' confidential information, Champlin prepared competitive drawings, met with customers and promoted and disseminated Impact's marketing materials for Impact's competing products.  Besse Aff. ¶ 61, Exh. 8, pp. 8-10.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THE REQUESTED INJUNCTIVE RELIEF

Plaintiffs will suffer irreparable harm if this Court does not grant the requested injunctive relief, as it is likely to lose its goodwill with customers as a result of Champlin's continued employment with Impact. *BNY Mellon, N.A. v. Schauer*, 2010 WL 3326965 *10 (Mass. Super. Ct. May 14, 2010) (loss of goodwill constitutes irreparable harm); *Stone Legal Res. Group*, 2003 WL 914994 at *6 (same). As Plaintiffs' employee, Champlin has already damaged Plaintiffs' relationship with their customers, promoted Impact in the context of purportedly marking Plaintiffs' products, usurped corporate opportunities and interposed bids on behalf of Impact. Besse Aff. ¶¶ 54-77. Champlin has demonstrated that he is willing to solicit Plaintiffs' customers, which will likely result in the loss of business that Plaintiffs will be unable to quantify. Plaintiffs may not know for years whether certain customers will leave Plaintiffs due to the Defendants' actions. *Hilb*, 2007 WL 5390399 ("The problem, however, is the long term. Once a client transfers

its business, there is no way to determine how long it would otherwise have stayed with [the employer], particularly in the absence of the individual employee familiar to it."); *Randstad Gen. Partner*, C.A. No. 09-2046-A, p. 6 (noting difficulty in developing a measure of damages that adequately compensates former employer for losses, because "it would be virtually impossible to determine whether or not [solicited] customers would have joined defendant's new employer without that solicitation or, even more importantly, how long they might remain and how much future business they might direct to the new employer.").

Plaintiffs are also at risk of losing their trade secrets and confidential information by virtue of Champlin's continued employment with Impact. *See Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616 (1980) (injunctive relief appropriate where plaintiff "*may* suffer a loss of right that cannot be vindicated should it prevail after a full hearing on the merits") (emphasis added). The risk that Champlin will use confidential information, even inadvertently, and thereby cause Plaintiffs to lose goodwill with its customers supports the entry of an injunction. *See IONA Techs.*, 2002 WL 1290217 at *3 (plaintiff need not wait until actual harm occurs to be entitled to injunctive relief). Absent injunctive relief, Champlin will be able to use confidential information obtained during his employment with Plaintiffs to compare Impact's products with Plaintiffs' products, potentially in an unfavorable and disparaging way, to compete directly and unfairly with Plaintiffs.[4] Thus, by his very employment with Impact and his efforts to convert Plaintiffs'

---

[4] Even assuming that Defendants are willing to certify that they will not use or disclose Plaintffs' confidential information, the harm to Plaintiffs cannot be avoided simply by Defendants' "intention not to disclose confidential information, or even by [their] scrupulous efforts to avoid disclosure." *Marcam*, 885 F. Supp. at 297. The doctrine of inevitable disclosure "allows the court to enjoin a former employee from working at a competitor of the employer . . . if the court finds that such employment would inevitably lead to disclosure" of confidential business information or trade secrets. *Architext, Inc. v. Kikuchi*, 2005 WL 28464244, *3 (Mass. Super. Ct. May 19, 2005); *Ounce Labs*, C.A. No. 08-2377-BLS1 ("the risk of subtle inevitable disclosure is precisely the type of competitive harm that a brief period of noncompetition is designed to prevent"); *Lombard*, 729 F. Supp.2d at 442 ("Despite defendants' assertions, it is impossible to imagine that they will not use, consciously or not, information they have gleaned during their time [with the former employer] . . . [D]isclosure would be inevitable.") (citing *Marcam*).

customers to Impact, Champlin continues to irreparably harm Plaintiffs' goodwill and reputation. *See, e.g., Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 50 (1998); *Touchpoint Solutions*, 345 F. Supp.2d at 32; *BNY Mellon*, 2010 WL 3326965 at \*10. Defendants should not be allowed to reap the benefits of Plaintiffs' work. Plaintiffs have "the right to keep the work which it has done… to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's." *Diversified Ventures, Inc. v. Moriarty*, 1994 WL 879858, \*18 (Mass. Super. Ct. 1994).

Allowing Champlin to continue working for Impact and soliciting Plaintiffs' customers will further damage Plaintiffs' legitimate business interests. Plaintiffs do not have an adequate remedy at law to compensate it for the Defendants' actions. *See Guerriero,* 2003 WL 23112398; *Stone Legal Res. Group*, 2003 WL914994 at \*6. Because the loss of Plaintiffs' confidential information and goodwill cannot be quantified, Plaintiffs have been irreparably harmed, and without injunctive relief, will be irreparably harmed further.

## III.   THE IRREPARABLE HARM TO PLAINTIFFS OUTWEIGHS ANY HARM THAT INJUNCTIVE RELIEF WOULD INFLICT ON DEFENDANTS

The balance of the hardships tips strongly in Plaintiffs' favor. As discussed above, Plaintiffs will be irreparably harmed in various ways if the Court does not grant the requested injunctive relief. The harm, if any, to Defendants if the Court prohibits Defendants from soliciting Plaintiffs' customers and employees pales in comparison to the irreparable harm that Plaintiffs will incur from the publication and exploitation of its confidential information and trade secrets. Moreover, denying injunctive relief would allow Defendants to use Plaintiffs' confidential information and exploit Plaintiffs' years of hard work and effort to compete unfairly with Plaintiffs. While it is true the injunction prevents Champlin from competing in Plaintiffs' industry,

286965.3

that is an outcome he bargained for, and for which he has been compensated.  In sum, the balance of harms weighs in favor of Plaintiffs and granting the requested injunctive relief.

## IV.      THE GRANTING OF THE REQUESTED INJUNCTIVE RELIEF WILL NOT ADVERSELY AFFECT THE PUBLIC INTEREST

Injunctive relief in this case will serve the public interest by upholding valid contracts and prohibiting the Defendants from unfairly competing with Plaintiffs. Fair competition is in the public interest. Unfair competition is not. As noted above, public policy supports enforcement of the agreements. "[I]t is [. . .] beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *Guerriero*, 2003 WL 23112398 at *10. An employer has a right to protect its trade secrets, confidential business information, and goodwill. *Edwards*, 2007 WL 2840360 at *6; *Lombard*, 2010 WL 2682449 at*4 ("The public has an interest in the enforcement of valid contracts."); *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929, *3 (D. Mass. June 4, 1996) ("It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged."). Nothing in the requested injunctive relief will have any adverse effect on the public interest, and to the contrary, will further the public interest.

## CONCLUSION

For the foregoing reasons, the Court should order an expedited hearing and, after the hearing, grant Plaintiffs' Motion for a Preliminary Injunction and issue a preliminary injunction consistent with the proposed Order, attached to said motion as Exhibit 1.

Respectfully submitted,

*/s/ Christopher Hennessey*
Christopher M. Hennessey (BBO# 654680)
COHEN KINNE VALICENTI & COOK LLP
28 North Street, 3rd Floor
Pittsfield, MA  01201
(413) 443-9399
chennessey@cohenkinne.com
September 13, 2022                **ATTORNEYS FOR PLAINTIFFS**

21

286965.3